N Jane DuBovy CSB#98817
Mandy S. L. Favaloro, CSB#239482
A2Z Educational Advocates
881 Alma Real Drive, Suite 309
Pacific Palisades, CA 90272
(310) 573-1430 Office
(310) 573 1425 Fax
njanedubovy@a2zedad.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT

| | |
|---|---|
| G.G., a minor, by and through his Parents, Rachel Good and Darren Good, and on their own behalves,<br><br>Plaintiffs,<br><br>        v.<br><br>Conejo Valley Unified School District,<br><br>Defendant | Case No.: 2:21-CV-9135<br><br>COMPLAINT AND PRAYER FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT (20 U.S.C. §1400 et seq.) and<br><br>COMPLAINT AND PRAYER FOR RELIEF FOR ATTORNEYS' FEES AND COSTS UNDER 20 U.S.C. §1415(i)(3). |

     Plaintiffs, G.G., a minor, by and through his Parents, Rachel Good and

Darren Good ("Plaintiffs"), and on their own behalf, hereby submit their

Complaint against Defendant, Conejo Valley Unified School District ("District" or "Defendant.) Through its Complaint, Plaintiffs request judicial review of the administrative decision issued by the California Office of Administrative Hearings ("OAH") on August 25, 2021, in the matter designated as OAH Case Nos. 2021020362/2021030817.  In support of their Complaint, Plaintiffs allege as follows.

## **INTRODUCTION**

1.     Plaintiffs request review of the OAH Decision rendered in the administrative hearing in the underlying matter.  This Complaint arises out of the IDEA and is brought pursuant to 20 U.S.C. §1425 and is timely as an appeal based on the authority of *Orange County Health Care Agency v. Dodge, et. al*, 793 F.Supp.2d 1121 (C.D. CA 2011).  This action is commenced to seek an order (1) reversing the decision of the California Office of Administrative Hearings, ("OAH") dated August 25, 2021, and (2) awarding appropriate relief under the Individuals with Disabilities Education Improvement Act (20 U.S.C. §§1415 et seq.) ("IDEIA").

## **JURISDICTION AND VENUE**

2.     This Appeal action arises under the IDEA.  This Court has jurisdiction of the matter under 20 U.S.C. §1415 and 28 U.S.C. §1331.  Pursuant to 20 U.S.C. §1415(i)(3)(A), the District Court's jurisdiction in this matter is without regard to the amount in controversy.

3.      Parents have exhausted all required administrative remedies in this matter by pursuing a due process case under the California Office of Administrative Hearings on all claims related to the provision of a free and appropriate public education ("FAPE") alleged herein.

4.      Venue is proper is the United States District Court, Central District of California, as authorized by 28 U.S.C. §§1391 & 1392.

## STANDARD OF REVIEW

5.      In evaluating a case filed under the IDEA, the District Court "shall receive the records of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. §1415(e)(2).  The District Court proceeding "under the IDEA is a hybrid, akin to a trial de novo." *Union School District v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

6.      Although, the District Court is required to give "due weight" to the decision of the ALJ, and the "court must ultimately reach an independent decision based on a preponderance of the evidence." *Board of Education v. Rowley*, 458 U.S. 176, 205 (1982). "Congress intended 'judicial review in IDEIA cases to differ … substantially from judicial review of other agency actions in which courts are generally confined to the administrative record and are held to a highly deferential standard of review.'" *Amanda J. v. Clark County School District*, 260 F.3d 1106

(9th Cir. 2001) (*quoting Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).

7.     The reviewing court must determine whether the school district met the legal requirements of the IDEA, based on the very specific facts of the particular case at hand.  *See San Rafael ES District v. California Special Education Hearing Office*, 482 F.Supp.2d 1152, 219 Ed. Law Rep. 676 (N.D. Cal. 2007)**.**

## PARTIES

8.     Plaintiffs in this proceeding are G.G., a minor child who resides with his Parents, Rachel and Darren Good; the individual Parents on their own behalf and on behalf of G.G. (hereinafter sometimes referred to as "Parents").  At all times relating to this matter Parents have resided in Westlake Village, California, within the boundaries of Defendant, Conejo Valley Unified School District, ("CVUSD" or "District").  Parents are responsible for the care, custody, and control of G.G. a minor child with a disability.  G.G. has diagnoses that include but are not limited to Autism, ADHD, and anxiety.

9.     Defendant CVUSD is a public-school district duly organized and existing pursuant to the laws of the State of California, is located in Ventura County, California, and is a Local Education Agency ("LEA") within the meaning of the IDEA.  The District is a recipient of federal financial assistance for purposes of the IDEA.  At all times relevant, CVUSD was and is the LEA responsible for

providing to G.G. a Free and Appropriate Public Education ("FAPE") within the meaning of the IDEA. CVUSD is governed by the laws of the State of California, the laws of the United States, and the Constitution of the United States in carrying out its duties and responsibilities.

## ALJ's FINDINGS THAT ARE NOT SUPPORTED BY THE RECORD

10. The ALJ erred by finding that the District considered Parents' concerns regarding placement at the December 2020 IEP because they participated in the IEP meeting when Parents are actually entitled to meaningfully participation.

11. The ALJ erred by finding that the District was not obligated to provide Parents with prior written notice within the December 14, 2020, IEP document for a program and placement that was offered to start on December 15, 2020.

12. The ALJ erred by determining that the waiver included in Student's May 2020 settlement agreement barred the claim that the December 2020 IEP did not need to meet the requirements for prior written notice, as the waiver specifically excluded the IEP.

13. The ALJ erred by finding that Plaintiffs were not entitled to prior written notice of the offer to change Student's placement from Bridges Academy to Colina MS because Parents had not previously agreed to the District's eligibility determination in October 2019.

14. The ALJ erred by ignoring considerable testimonial and documentary

evidence that demonstrated that Defendant's December 2020 IEP did not contain all elements of prior written notice given the fact that it contained differing offers of the frequency and duration of services.

15.     The ALJ erred by finding that regardless of what CVUSD offered in the December 14, 2020, IEP that Parents would have rejected it and continued Student's attendance at Bridges. The ALJ ignored the evidence of Parents' legitimate concerns about the program offered in the IEP.

16.     The ALJ erred by finding that Student introduced no evidence that recreational therapy was an area of suspected disability that required the District to assess in this area.

17.     The ALJ erred by finding that Student did not need additional goals to receive an educational benefit because the goals written by the District met <u>some</u> of his needs.

18.     The ALJ erred by finding that because Student had done well academically in school prior to being found eligible for special education and related services that the program offered by the District in December 2020 was FAPE.

19.     The ALJ erred by finding that the decrease in Student's achievement scores after school closures due to the COVID-19 pandemic was due to placement at Bridges when there was no evidence or testimony indicating this to be the case.

20.     The ALJ erred by finding that Student required only modest academic

support from a special education teacher to enable him to make adequate academic progress as this ignores Student's non-academic needs.

21.     The ALJ erred by placing the onus on Parent at the time of the December 2020 IEP to request alternative appropriate school placements for Student and to request funding for a private school placement at the December 2020 IEP meeting, an action the IEP team could not take.

22.     The ALJ erred by finding that the District provided appropriate accommodations to Student in the December 2020 IEP to offer Student a FAPE.

23.     The ALJ erred by finding that the District was not required to include a behavior support plan in the December 2020 IEP to offer Student a FAPE.

24.     The ALJ erred by finding that the District was not required to offer special education and related services for the 2021 extended school year in order to offer Student a FAPE.

25.     The ALJ abused her discretion and erred by failing to address the testimony of Student's expert witness, Dr. Gottlieb, who testified that the District's offer of an educational program in the December 2020 IEP would not meet Student's needs.

26.     The general tone of the ALJ's decision in this matter indicated a bias against Parents.

//

**STATEMENT OF FACTS**

27.    G.G. is a student who has at all relevant times resided within the District and is eligible for special education and related services.  G.G.'s current school of residence within the District is Colina Middle School.  G.G.'s current school of attendance is Bridges Academy, a private school.

28.    G.G. enrolled at Westlake ES, his school of residence in CVUSD, for first grade, (2015-2016).  G.G. continued to attend Westlake ES through 4th grade (2018-2019).

29.    On November 24, 2018, Dr. Gottlieb completed a Neuropsychological Assessment of G.G. on behalf of Parents.  Dr. Gottlieb found that G.G. met DSM-5 criteria for ADHD combined presentation, Other Specified Neurodevelopmental Disorder in auditory processing, sensory regulation and social cognition, and Other Specified Anxiety Disorder with generalized worry and obsessions-compulsions. Dr. Gottlieb found that G.G.'s diagnoses and related weaknesses functionally limited his everyday learning, socialization and execution, thereby affecting his anxiety and self-esteem.

30.    Dr. Gottlieb's recommendations included: continuation of behavioral therapy and psychotherapy; a functional behavior assessment and behavior support plan; and specialized education that would address his auditory processing, sensory regulation, motor output and academics.  He also recommended accommodations

to include scaffolding of assignments, minimization of distractions, permit fidgeting or standing, use of an e-reader, use of a computer for writing, testing via short answer or recognition, quiet room for exams, take an exam over several days, and 50% extended time for assignments and exams.  Dr. Gottlieb noted that in his opinion G.G. would qualify for an IEP based on the fact that he underachieved relative to his intellectual ability.

31.     During the 2018-2019 school year, per Parents, there were concerns throughout the school year related to bullying, isolating G.G. from group work, as well as other academic and social issues. Parents were repeatedly told that G.G. would not be found eligible for an IEP as he was receiving passing grades.  Parents had multiple meetings, emails and contact with school and District personnel surrounding their concerns.

32.     On June 15, 2019, Parents provided the District with notice of their intent to unilaterally place G.G. at Bridges Academy and seek reimbursement for such placement given the District's failure to assess G.G. for special education.

33.     On June 21, 2019, the District sent Parents an assessment plan for initial assessments for G.G.  Parents signed the assessment plan on or before July 12, 2019.

34.     In July 2019, Dr. Karen Conway assessed G.G. on behalf of the Regional Center and diagnosed G.G. with Autism Spectrum Disorder ("ASD").

35.    In August 2019, Parents met with District personnel who offered two alternative elementary schools, but Parents noted there were no differences in the program between Westlake Elementary School, G.G.'s school of residence, and the other schools.

36.    In August 2019, G.G. started 5th grade at Bridges Academy pursuant to the notice provided by Parents in June 2019.

37.    In October 2019, the District conducted initial evaluations.

38.    On October 17, 2019, the District issued a Multidisciplinary Team Assessment Confidential Psycho-Educational Report.  The report includes a short summary of Dr. Gottlieb's November 2018 Neuropsychological Assessment and Dr. Karen Conway's July 2019 Psychological Assessment, which Parents had provided to the District. The assessors found that G.G. met eligibility requirements under OHI and ED.

39.    On October 24, 2019, the District held an Initial IEP.  The team found G.G. eligible under OHI.  Parents signed for attendance only and noted they did not agree with the eligibility, goals or services.

40.    On March 27, 2020, Parents filed for due process (OAH Case No. 2020031007).

41.    On May 15, 2020, the Parties reached a settlement agreement that provided for reimbursement at Bridges for the 2019-2020 school year, the first semester of

the 2020-2021 school year, reimbursement for services from an educational specialist, and a social skills group.  The agreement provided that Student would be considered a privately placed student and that the District had no obligation to assess or offer a FAPE unless Parents elected to seek an assessment and an IEP for the second semester of the 2020-2021 school year.

42.     The agreement included a waiver that stated that

> "Parents, on behalf of themselves and Student, hereby fully release and discharge the District, including but not limited to, their past and present officials, employees, successors, predecessors, assigns, agents, attorneys, consultants, affiliates, and representatives from all claims, damages, liabilities, rights, and complaints of whatever kind or nature arising from or related to Student's educational program through and including December 31, 2020 *except as to any disagreement as to the assessment results and IEP that may result from Parents' request for an assessment and IEP." (emphasis added)*

43.     G.G. started 6th grade at Bridges for the 2020-2021 school year.

44.     On September 17, 2020, and in accordance with the settlement agreement, Parents requested assessments from CVUSD in the areas of psychoeducational, social/emotional, OT, LAS, RT and central auditory processing.

45.     Per records, an Student Study Team (SST) meeting was held on September 29, 2020 with Parents and District staff  in order to determine what assessments the District would conduct. Per Parent, the District representatives had no records or information about G.G. at the time of the SST meeting.

46.     On October 5, 2020, the District provided Parent with an assessment plan but ti did not incldue recreational therapy or central auditory processing.  Parents signed the assessment plan on October 7, 2020.  The District provided Parents with a prior written notice letter when they provided the assessment plan but the letter did not indicate why the District rejected the request for the recreational therapy or central auditory processing assessments.

47.     On November 30, 2020, more than seven weeks after receiving Parent consent for assessments, G.G. had his first testing session with the CVUSD school psychologist, Monika Agrawal at Colina MS.  Per Mrs. Good, it took her ten minutes to coax G.G. out of the car as he was worried about seeing anyone he knew from elementary school, where he had been bullied by peers.

48.     On December 14, 2020, the District completed a Psychoeducational report by Ms. Agrawal, School Psychologist, Donna Manley, Special Education Teacher, and Jennie McIntosh, Speech Pathologist.  The report indicated that Dr. Gottlieb's November 2018 report had been reviewed as part of the writign of the assessment,

49.     G.G.'s cognitive abilities were in the very high range, consisten with Dr. Gottlieb's assessment.  Rating scales completed by Parents were significant for concerns related to G.G.'s emotional and behavioral regulation, as well as adaptive skills.  Teachers scales indicated elevated concerns in atypicality, withdrwal, hyperactivity, conduct problems, anxiety, depression, attention problems, study

skills, and learning problems.  The assessor noted that per her observation as well as student records, that G.G. exhibited high levels of inattention and distractibility and had significant struggles to stay on task without prompting and redirection. Behaviors observed also included sniffing his hands, off-task behaviors, and impuslive behaviors.  In the area of academics, written expression appeared to be an area of weakness.

50.     The assessors found that G.G. met eligibilty criteria under OHI and ED.  The team found that G.G. did not meet eligiblity requirements under ASD.

51.     On December 14, 2020, the District held G.G.'s IEP.  The team found him eligible under OHI with a secondary eligiblity of ED.   THe IEP did not contain a behavior support plan despite having goals to address G.G.'s impulsive behaviors, off-task behaviors and requesting a break as the team had not conducted a functional behavior assessment to determine the function of his behaviors. There were no goals in the area of recreational therapy as the team had not conducted an assessment or reviewed needs under that discipline.  The IEP did not include goals to address the transition from Bridges to Colina.

52.     The IEP team wrote accommodations but they did not include accommodations that had been recommended by Dr. Gottlieb including allowing G.G. to move around the room or accommodations to address his reading, which was identified as a concern by the District's most recent assessment.

53.     The District's offer of placement was in a general education setting with related services that included 60 minutes per week of SAI in English Language Arts to be provided in a general education class, 88 minutes per week of SAI study skills to be provided in a special education classroom, 45 minutes per week of individual counseling, 45 minutes per week of counseling and guidance, 60 minutes per month of SAI Academic Consultation/Collaboration through 3/15/21, and 60 minutes per month of SAI Social/Behavior Consultation/Collaboration through 3/15/21.   The District also offered "intensive indivdiualzied services," ("IIS") which were noted to be a 1:1 aide but the offer of those services was unclear in the IEP document.  On one page (page 1/19) the offer of the 1:1 aide is for 1,526 minutes per week in both general education and special education classrooms through 1/15/21; and on another page (page 16/19) the offer of the 1:1 aide is for 176 minutes per week in both general ducation and special education classrooms through 3/15/21.

54.     The District did not offer ESY.

55.     The IEP does not contain a BSP despite noting that behaviors would interfere with learning. Parents asked how the hand sniffing would be addressed in school and were told it would be addressed via Counseling.

56.     A number of the services included in the IEP were noted to start on December 15, 2020, the day *after* the IEP was held, and two days before witner

break, but Parent was not provided with a copy of the IEP until December 21, 2020, after winter break had begun.

57.     On January 12, 2021, Parent received the final version of the District's psychoeducaitonal report as Ms. Agrawal had revised it to include information from G.G.'s outside providers who she was unable to get in touch with prior to the IEP meeting.   Dr. Stazan Sina, who had been G.G's psychologist since May 2018, shared that he worked with him once per week.  Dr. Sina recommended that G.G. continue at Bridges Academy.  Dr. Marc Rosenthal, G.G.'s psychiatrist, noted that G.G. had made progress and there were positive changes since enrolling at Bridges and the implementation of ABA services.  He recommended that G.G. continue to receive ongoing specialized care, limited distractions, intensive behavioral interventions, and consistency of services.

58.     None of the information from the oustide providers was shared with the IEP team at any time.

59.     On January 28, 2021, Parents signed the IEP indicating that they agreed with the eligibility determination but did not agree with the offer of placement and services.

60.     On February 9, 2021, Parents filed for due process on behalf of G.G. alleging procedural and substantive violations of FAPE under the IDEA.

61.     On February 22, 2021, the District filed a response to Parents' due process

complaint which included an assessment plan proposing to conduct an FBA, CAP assessment and an RT assessment.

62.     On March 23, 2021, the District filed for due process against Student and Parents with a singular issue on whether or not the December 14, 2020, psychoeducational assessment was appropriate.

63.     On March 26, 2021, Parents consented to the proposed assessments.

64.     On May 7, 2021, the District provided, for the first time, a prior written notice letter in response to Parents' disagreement with the December 2020 IEP. The letter summarized the offer of placement and services as:

> "placement in 6th grade general education at Colina with the following special education supports and services: 148 minutes per week of SAI, 45 minutes per week or counseling and guidance, individual counseling 45 minutes per week, one to one aide for [G.G.'s] transition from Bridges to Colina for 1446 minutes per week until at least January 15, 2021, and consultation and collaboration services for [G.G's] teachers and services providers as [G.G.] transitioned from Bridges to Colina for 120 minutes per month until at least March 15, 2021."

65.     The frequency on the 1:1 aide service, 1446 minutes per week, was different than either of the two previous offers contained in the December 2020 IEP.

66.     The hearing in the due process matter took place via video conference on June 8, 9, 15, 16 and 17, 2021.

67.     The issues before the judge included

   a. Issue 1: Did Conejo Valley deny Student a free appropriate public education ("FAPE") by significantly impeding Parents' opportunity to

participate in the decision-making process regarding providing Student a FAPE, and depriving Student of educational benefits, by failing to provide Parents an assessment plan within 15 days of Parents' request for an assessment for central auditoryprocessing disorder and of Student's need for recreational therapy?

b.  Issue 2: Did Conejo Valley deny Student a FAPE by significantly impeding Parents' opportunity to participate in the decision-making process regarding providing Student a FAPE, and depriving Student of educational benefits by failing to provide all of Student's Educational records within five days of Parents' January 5, 2021, request? [1]

c.  Issue 3: Did Conejo Valley deny Student a FAPE by significantly impeding Parents' opportunity to participate in the decision making process regarding providing Student a FAPE, and depriving Student of educational benefits, by failing to include in the December 14, 2020 individualized education program, called an IEP, a description, individualized for Student, of the means by which the special education and related services of the IEP would be provided during emergency conditions when instruction or services could not be provided to Student either at schoolor in-person for more than 10 school days?

d.  Issue 4: Did Conejo Valley deny Student a FAPE by significantly impeding Parents' opportunity to participate in the decision-making process regarding providing Student a FAPE, and depriving Student of educational benefits, in the December 14, 2020, IEP by failing to consider Parents' concerns regarding placement?

e.  Issue 5: Did Conejo Valley deny Student a FAPE by significantly impeding Parents' opportunity to participate in the decision-making process regarding providing Student a FAPE, and deprivingStudent of educational benefits, in the December 14, 2020, IEP by failing to provide Parents prior written notice with all required information related to Conejo Valley's proposed change of placement?

_____

[1] Student dropped this issue on the record during the hearing in this matter, yet the ALJ failed to note this in her decision.

f.  Issue 6: Did Conejo Valley deny Student a FAPE by failing in the December 14, 2020, psychoeducational assessment to conduct appropriate assessments in all areas of suspected disability?

g.  Issue 7: Did Conejo Valley deny Student a FAPE by failing to assess Student in all areas of suspected disability, specifically: (a) Student's need for recreational therapy; (b) central auditory processing disorder; and (c) behavior, through a functional behavior assessment?

h.  Issue 8: Did Conejo Valley deny Student a FAPE by failing in the December 14, 2020, IEP to: (a) develop appropriate goals in all areas of unique need; (b) offer an appropriate placement; (c) offer appropriate and sufficient accommodations; (d) offer an appropriate behavior support plan based on assessment of Student's needs; and (e) offer Student special education and related services for the 2021 extended school year ("ESY")?

i.  Issue 9: Did Conejo Valleys' December 14, 2020, psychoeducational assessment comply with legal requirements such that Student is not entitled to an independent educational evaluation in psychoeducation at public expense?

68.  Parent testified that they were unable to express their concerns at the December 2020 IEP meeting because the District did not provide them with sufficient information during the meeting and failed to provide a clear offer either during or after the IEP meeting that allowed them to adequately express their concerns to the District.

69.  Parent received and signed an assessment plan for assessments that would form the basis of Student's December 2020 IEP. The initial draft of the Multidisciplinary Assessment was not provided to Parent until the time of the IEP

at which point, they were expected within the confines of a two-hour meeting to review the 67-page document and be able to articulate all of the questions they had during the meeting.

70.     The draft assessment did not include the information from the outside providers. Ms. Good testified and evidence showed, however, that Parents had provided the District with contact information and a release for Bridges on or around October 7, 2020, when they signed the assessment plan, but the District did not reach out to Bridges until November 16, 2020.  Ms. Good testified that when asked if there were any further providers that Ms. Agrawal should speak to, a week before the IEP, Parent again provided signed releases for other outside providers on December 10, 2020. The evidence is clear that Parent provided the information to the District in a reasonable amount of time when requested.  Ms. Good testified that for some providers she had to sign an additional release in order to allow them to speak with District representatives, which understandably took some time.

71.     Ms. Good testified that after Ms. Agrawal received the information from the outside providers, she updated her report and sent it to Parents on January 12, 2021. Ms. Agrawal testified that she did not think it was necessary to call another IEP meeting to have the entire team review the information from the outside providers as she alone had deemed the information was not significant to share with the IEP team.

72.     Ms. Agrawal testified that she had not reviewed Dr. Gottlieb's report but rather had used the summary from the previous District report to prepare her summary.  As a result, Dr. Gottlieb's recommendation that Student have access to "specialized education for auditory processing, sensory regulation, motor output and academic execution," and accommodations that allowed for minimizing auditory, visual, and tactile distractions, as well as to permit fidgeting or standing were not included provided to the December 2020 IEP team.  Furthermore, Ms. Agrawal testified that her report in its entirety was *never* provided to the entire IEP team.

73.     The offer of services provided for within the December 2020 IEP was unclear even to the District witnesses.  At the hearing District witnesses were unable to identify which special education classroom had been offered to Student when asked to review the IEP for testimony.  District witnesses testified that the 88 minutes per week of SAI was *either* a study skills class provided during 22-minute period know as CORE, or a Directed Studies class that met for an entire period. Ms. Good testified that she was told subsequent by staff to the IEP that the program was the SAI Directed Studies class as the SAI Study Skills class (CORE) had not met during the entire 2020-2021 school year.

74.     This confusion prevented Parents from being able to make a determination what program was offered and if it would have been appropriate for Student which

impeded their ability to meaningfully participate in the IEP process.

75.     Dr. Gottlieb testified, as he noted in his report, that Student's weaknesses limited his everyday socialization.  Student testified that while enrolled in the District he had found it difficult to make friends and was often made fun of by other students for some of his behaviors.  Ms. Good testified that she had been advised by counsel, after reviewing G.G.'s file to request a recreational therapy assessment.  Ms. Good testified that she made that request on September 17, 2020 and did not receive a response to that request until February 2021. Ms. Agrawal testified that she has reviewed the request and unilaterally determined that it was not necessary and therefore did not include it in the October 5, 2020, assessment plan.  Recreation therapy is a related service recognized in the State of California, augmenting other related services identified by the IDEA.

76.     District witnesses testified that during observations of G.G. at Bridges he displayed a number of behaviors, which included hand-sniffing, attention issues, and impulsive behaviors.  Student testified that when he was still in elementary school at the District, he displayed behaviors he described as "crazy" which included going under tables and "doing weird stuff" that annoyed other kids.  Ms. Agrawal testified that an IEP team determines if a behavior is significant through reviewing records, current data, standardized testing, input from outside providers, parents, teachers, and Student, and noted the best way to do so would have been

through an FBA.  District witnesses testified that they had sent out an assessment plan that included an FBA in February 2021 after the filing of the due process complaint.

77.     District witnesses testified that they had not included goals in all areas identified within the IEP, such as social skills, as they felt the other goals already included would address G.G.'s needs.  Ms. Agrawal testified that she felt that a goal to aid in G.G.'s transition from Bridges to Colina was not necessary as she felt it was a temporary need with an end date.

78.     District witnesses testified that during the December 2020 IEP that several IEP team members had not taken part in the discussion of what placement was appropriate as they felt it was outside their purview to do so.  Ms. Agrawal testified that she had been the one to recommend placement in a general education program with a 1:1 aide, and she had recommended the SAI Study Skills class even though she had not observed the particular class she was recommending.

79.     Student's expert witnesses, who had either assessed or worked with G.G. for some time, testified that Student required a supported placement in a smaller setting, with small class size, and individualized support for academics and social emotional needs.  Student's expert witnesses testified that they spoke with Ms. Agrawal in December 2020 and January 2021 and shared with her that the placement at Bridges was appropriate and that they had concerns about G.G. going

to a campus with larger classes and without the supports that were built into the Bridges program.

80.     Student's expert witness, Dr. Gottlieb, testified that the placement offered by the IEP team would not meet Student's needs. Dr. Gottlieb testified that he did not think switching Student's placement mid-year was appropriate as Student had difficulty with transitions. Dr. Gottlieb testified that if a general education classroom had 20-30 students, it would be too many for Student given his difficulties with inhibition, sustained attention, and auditory sensitivity which he had identified during his assessment. Dr. Gottlieb testified that the appropriate placement for Student would include a classroom with less stimulation, more adults per student, and people who understood Student's condition and could act in real time continuously throughout the day. Dr. Gottlieb testified that the aide offered to Student would not address his areas of need especially if only provided for several weeks. He also testified that given the myriad of supports that had previously been provided by Parents, which had not addressed G.G.'s needs, he did not think an aide would be sufficient to meet his needs. On the other hand, Ms. Agrawal testified that she had suggested the implementation of the aide service as she felt Student would have difficulty with the transition to Colina MS but admitted that she had not asked any of his teachers or outside providers for their input on what could be done to support a transition.

81.     Ms. Manley, the special education teacher who assessed Student in December 2020 and attended the December 2020 IEP, testified that based on her observations of Student during testing that he would benefit from accommodations to be allowed to move around the room and to have visual cues to stay engaged during auditory tasks.  These accommodations were also recommended by Dr. Gottlieb in his November 2018 report, which the District had been provided. Ms. Manley also noted in her report that G.G. read quickly and made unnecessary errors while reading multi-syllabic words. The IEP, however, does not contain any accommodations that would allow Student to move around the room, provide for visual cues during auditory tasks or prompts to slow down when reading.

82.     Ms. Agrawal testified that Student had behaviors that interfered with his learning including hand-sniffing, attention, and impulsive behaviors, which she saw during her testing and during her observation of him at Bridges.  She also testified that Student's stereotypical behavior of hand sniffing was an inappropriate response to his anxiety, and he should be taught a replacement behavior.  She testified that a replacement behavior, which would be included in a BSP had the District written one for G.G.'s IEP.

83.     Ms. Agrawal testified that the team determined that Student did not require ESY placement or services but admitted that she had not asked any of his teachers at Bridges or his outside providers about their opinion regarding Student's

regression and recoupment and she had no data regarding as much. Ms. Agrawal also testified that she was not aware if there was a program for students who received SAI and other related services or if a student could be provided with just related services during ESY.

84.     On August 25, 2021, OAH issued a Decision in the matter wherein the ALJ found that the District prevailed on all issues.

## SUBSEQUENT FACTS

85.     On September 3, 2021, the District held an Amendment IEP to review the RT assessment, CAP assessment and the FBA, which had been completed in May and June of 2021 but were not provided to Parent until September 2021, just prior to the IEP meeting.

86.     The results of the CAP assessment indicated that G.G. did not present with results indicated of a CAP deficit but felt that the variable performance on tasks was due to his inattentive behaviors. G.G.'s poor performance on monaural low redundancy tasks may be symptom of other top-down processing differences and not be truly reflective of central auditory processing abilities.

87.     Ms. Agrawal and Nizari Amin, M.A., BCBA, completed the Functional Behavior Assessment Report.  The assessors conducted four observations of G.G. over four different dates in May 2021 at Bridges Academy ranging in time from 20 to 30 minutes. The assessors concluded that based on direct observations and data

collection G.G. did not demonstrate off- task and smelling behaviors at significant rates that impeded his learning. The assessors failed, however, to extrapolate out the data collected during their observations to the entire school day to get an estimate of how often G.G. may have exhibited behaviors on a daily basis.

88.     Jennifer Mayer, RTC, CTRS, completed a Recreational Therapy Assessment Report.  The assessor found that throughout the assessment activities G.G. demonstrated difficulties consistently utilizing the necessary reciprocal interactions (negotiating, complimenting, offering an idea, and compromising) along with perspective taking skills and showing an interest in others to sustain engagement in cooperative lessons. During the informal measures portion of the assessment, G.G. had difficulty reading overt social cues and allowing the assessor respond or comment when answering questions. The assessor also found that G.G. may have difficulty interpreting the social cues of interactions based on his responses after viewing videos of social scenarios.  The assessor found that while engaged in 1:1 adult interactions, highly preferred subjects, or interactions with familiar peers, G.G. demonstrated many of the necessary cognitive and social skills to engage in school-based cooperative learning. However, he was observed by the assessor and reported to have difficulty applying his existing social knowledge in the moment and on a consistent basis. The assessor found that G.G. had difficulty anticipating the action or intent of others, joining in conversations, staying on

topic, activities within social situations and utilizing reciprocal interaction skills in the moment. She concluded these difficulties would impact his ability to engage in cooperative learning lessons and activities within his educational program.

89.    At the IEP meeting, Ms. Mayer, the RT assessor who is not an employee of the District, proposed two goals during the IEP meeting related to G.G.'s inflexibility and his large reaction to small problems, which she felt would become more difficult in a general education setting.  She recommended that he have targeted goals in perspective taking and emotional regulation to allow him to access aspects of his educational environment, including group learning.  The District IEP team members, however, chose not to adopt any of these goals.  As a result, the September 2021 IEP did not include goals related to recreational therapy to address G.G.'s identified needs.

90.    The IEP team continued to offer the same placement and services as in the December 2020 IEP without further explanation as to why the team felt these services were sufficient. The offer of FAPE was announced at the end of the IEP meeting and while Parents indicated their areas of concern there was very little discussion among the District IEP team members as to why they felt this program met G.G.'s needs.

91.    While the same placement and services were offered, there was additional discussion at the September 2021 IEP meeting which further confused Parents as

to the program that had been offered in December 2020.  During the IEP a District IEP team member noted that the offer of SAI included placement in a class co-taught by a special education and general education teacher, but this was not memorialized in any IEP document.  The 45 minutes per week of "counseling and guidance" was described during the IEP as both group counseling and a "social skills group."  The IEP, however, does not include any social skills goals despite concerns raised by the Parents and the RT assessor.

92.     During the IEP meeting it became clear that the District IEP team members had very little understanding of the role of recreational therapy as part of an IEP program.  Given that the team would not include any additional goals recommended by Ms. Mayer, the team never discussed what services it could offer to address these needs. Ms. Mayer, however, did recommend that G.G. would benefit from recreational therapy services to address the deficits she had identified.

93.     Parents shared during the IEP that they were concerned about placement at Colina specifically because of the fact that G.G. had been bullied by children that were now attending Colina which would cause him anxiety.  A District representative went on to state that if the IEP could be implemented at G.G.'s home school that was "always" the team's recommendation for placement and that the team was not authorized to make the consideration for change to a different placement.  Parents were told that they could exercise their option for school

choice. The team did not consider whether or not Colina was appropriate for G.G. given his unique needs and previous experience in the District and put the burden on Parents to determine what services were available on different CVUSD campuses.

94.     On September 29, 2021, Parents notified the District in writing, through their attorney, that they continued to agree that G.G. qualified for special education and related services but disagreed with the offer of goals, services and placement. Parents also notified the District that there were a number of inaccuracies in the IEP document.

95.     On November 15, 2021, the District sent Parents a prior written notice letter indicating that they had offered G.G a FAPE and denying reimbursement for Bridges Academy.  The District does not indicate in its letter that it had considered placement in an alternative District middle school placement.  The letter did not provide clarification on a number of the concerns noted by Parents.

96.     On November 17, 2021, the District convened Student's Annual IEP but did not complete the IEP or make an offer of FAPE.

## **FIRST CLAIM FOR RELIEF**

**Defendant's procedural violations resulted in a failure to ensure meaningful parent participating in the December 2020 IEP and at all relevant times thereafter, and denied Student a FAPE, and The ALJ erred in determining that the District did not impede Parents' meaningful participation in the IEP process by committing procedural violations.**

97.     Paragraphs "1" through "96" are re-alleged herein as if fully restated.

98.     The conduct of Defendant as alleged herein has violated and continues to violate Parents' rights to meaningful participation in the IEP process and Student's right to a FAPE as guaranteed under the IDEA.

99.     The law indicates that a procedural violation constitutes a denial of FAPE if it (1) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to their child, or (2) caused a loss of educational benefits to the child. 20 U.S.C. §1415(f)(3); 34 C.F.R. §300.513(a)(2); Cal. Educ. Code §56505(f).

100.    Here Defendant failed to consider Parents' concerns regarding the placement determination when developing Student's IEP and failed to provide Parents prior written notice with all required information related to Defendant's proposed change of placement. *See* 20 U.S.C. §1414(d)(3)(A)(ii); Cal Educ. Code §56341.1(a)(2); 20 U.S.C. §1415(b)(3), 34 C.F.R. §300.503; *see also Amanda J. v. Clark County School Dist.*, 267 F. 3d 877, 882 (9th Cir. 2001); These violations of the procedural requirements each caused a loss of educational benefits and denied meaningful participation.

101.    Defendant violated procedural requirements of the IDEA in development of the December 2020 IEP, and at all relevant times thereafter, which resulted in a

failure to ensure meaningful parent participation and denied Student a FAPE.

102.   The ALJ erred as a matter of law by applying the wrong standard and finding that the District did not significantly inhibit Parents' "opportunity to participate" in the decision-making process when Parents have the right to *meaningfully participate* under the law.  20 U.S.C. §1414(d)(3)(A)(ii); Cal Educ. Code §56341.1(a)(2).

103.   The ALJ abused her discretion and erred by failing to take into consideration evidence and testimony that the information presented to Parents at the time of the IEP meeting was so voluminous that it inhibited their ability to participate in the IEP and share their concerns with the IEP team to the extent necessary to ensure meaningful participation.

104.   The ALJ abused her discretion and erred by failing to take into consideration the fact that Parents and the entire IEP team did not meet after the December 2020 IEP meeting when additional information collected by Ms. Agrawal that recommended that Student not be removed from his current placement at Bridges Academy, which inhibited their ability to share concerns expressed by the outside providers with the IEP team to the extent necessary to ensure meaningful participation.

105.   The ALJ abused her discretion and erred by failing to take into consideration evidence and testimony that Defendant did not provide prior written notice within

the December 2020 IEP document, to clarify what services and programming Defendant was actually offering to Student and when those services would be provided.

106.   The ALJ erred as a matter of fact and law by determining that the waiver included in Student's May 2020 settlement agreement barred the claim that the December 2020 IEP did not need to meet the requirements for prior written notice, as the waiver specifically excluded the IEP.

107.   The ALJ erred as a matter of fact and law by determining that the waiver included in the Student's May 2020 settlement agreement barred the claim that the District was obligated to provide Parents with prior written notice regarding the change in placement entirely as the District's December 14, 2020, offer had a start date of December 15, 2020. The ALJ cites to no authority that this was not an ongoing violation that inhibited Parents' right to meaningful participation within the decision-making process.

108.   The ALJ erred as a matter of fact and law by finding that Plaintiffs were not entitled to prior written notice of the offer to change Student's placement from Bridges Academy to Colina MS because Parents had not previously agreed to the District's eligibility determination in October 2019  The ALJ did not cite to any authority for her conclusion that prior written notice is not required within an initial IEP or that a change in placement, ratified by a school district via a

settlement agreement, to a home school is not considered a change in placement that triggers prior written notice.

109.   The ALJ abused her discretion and erred by ignoring considerable testimonial and documentary evidence that demonstrated that Defendant's December 2020 IEP did not contain all elements of prior written notice as it was unclear as to the offer of placement.

110.   The ALJ abused her discretion and erred by ignoring considerable testimonial and documentary evidence that demonstrated that Defendant failed to meet its legal obligation under the IDEA and California law to ensure meaningful Parent participation, which resulted in a loss of educational benefit thereby procedurally denying Student a FAPE when Defendant failed to consider Parents' concerns regarding placement at Colina MS and failed to provide Parents with legally sufficient prior written notice regarding the change in placement.

## SECOND CLAIM FOR RELIEF

**Defendant denied Student a FAPE by failing to assess in all areas of suspected disability and The ALJ erred by finding that Defendant did not deny Student a FAPE by failing to assess in all areas of suspected disability**

111.   Paragraphs "1" through "110" are re-alleged herein as if fully restated.

112.   Districts must assess a student in all areas related to the suspected disability. *See* 34 C.F.R. §300.304(c)(4).

113.   The ALJ abused her discretion and erred in her finding that Defendant was

not obligated to conduct a recreational therapy assessment because it was not an area of suspected disability despite Parent having requested the assessment in September 2020, thus alerting the District to concerns in this area.

114.   The ALJ abused her discretion and erred by not taking into consideration the evidence that Defendant eventually provided Parent with an assessment plan for recreational therapy after Student had filed for due process.

115.   The ALJ erred in determining that Defendant did not deny Student a FAPE by failing to assess in all areas of suspected disability.

### THIRD CLAIM FOR RELIEF

**Defendant failed in the December 14, 2020 IEP to make FAPE available to Student and The ALJ erred in determining that Defendant did not deny Student a FAPE from December 2020 through the time of the Decision.**

116.   Paragraphs "1" through "115" are re-alleged herein as if fully restated.

117.   The conduct of Defendant as alleged herein has violated and continues to violate Plaintiff G.G.'s right to a FAPE as guaranteed under the IDEA. Defendant failed to meet its legal obligation under the IDEA and California law to offer and provide Student with a program that met his unique needs and provided G.G. with a FAPE in the December 2020 IEP and at all relevant times thereafter, by failing to develop goals in all areas of unique needs, offer an appropriate placement, offer appropriate and sufficient accommodations, offer an appropriate behavior support plan; and offer a 2021 ESY program

118.   The ALJ abused her discretion and erred by ignoring considerable testimonial and documentary evidence that Student required a supported placement in a smaller setting, with small class size, and individualized support for academics and social emotional needs.

119.   The ALJ abused her discretion and erred by failing to address the testimony of Student's expert witness, Dr. Gottlieb, who testified that the District's offer of an educational program in the December 2020 IEP would not meet Student's needs. Based on the foregoing the ALJ erred in her determination that Defendant was not denied a FAPE.  Defendant violated the IDEA and California law and denied Student a substantive FAPE within the December 2020 IEP and at all relevant times thereafter.

### FOURTH CLAIM FOR RELIEF

**The ALJ erred by failing to consider Parents' claims for reimbursement for their unilaterally funded services and placement.**

120.   Paragraphs "1" through "119" are re-alleged herein as if fully restated.

121.   Parents are entitled to reimbursement if a unilateral placement or services meet the child's needs and provided the child with an educational benefit, and it is not necessary for the private placement or services to meet the strict IDEA definition of a FAPE, or that it is certified to provide special education. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993).

122.   Under the IDEIA reimbursement remedies are part of the court's resources in crafting "appropriate relief" and therefore equitable considerations are relevant once the court determines that the placement was appropriate.  *See Sch. Comm. Of the Town of Burlington v. Dept of Educ.*, 471 U.S. 359, 374 (1985); *see also* 20 U.S.C. §1412(a)(10)(C)(iii); 34 C.F.R. §300.148(d).

123.   The ALJ erred as a matter of law when she failed to award reimbursement for the unilateral services and placement provided to G.G. from January 2021 forward.

124.   Following a *reversal* of the ALJ's decision in this matter Court, it must then take into consideration the equitable factors in this matter and find that the totality of the evidence supports full reimbursement to Plaintiffs for private therapy services provided and for placement of G.G. at Bridges.

## **FIFTH CLAIM FOR RELIEF**

**Plaintiffs seek payment/reimbursement of their reasonable attorneys' fees and costs incurred in this action.**

125.   Paragraphs "1" through "124" are re-alleged herein as if fully restated.

126.   Pursuant to the IDEA, Parents are entitled to payment/reimbursement of their reasonable attorneys' fees and costs from CVUSD if they are the prevailing party in this action, both for the costs incurred in the underlying matter and for pursuit of the present case.

## **PRAYER FOR RELIEF**

127.   Plaintiffs request that this Court enter an order requiring the entire administrative record, including Exhibits, Transcripts, Briefs, Pleadings and the ALJ's Decision, to be filed with the Court;

128.   Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Defendant did not impede Parents' meaningful participation in the IEP process by committing procedural violations be reversed;

129.   Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Defendant assessed in all areas of suspected disability be reversed;

130.   Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Defendant did not deny Student a FAPE be reversed;

131.   Plaintiffs request that this Court grant such relief as it deems just and appropriate under IDEA, including:

    a.   An order that Plaintiffs be reimbursed for the full cost of, and all expenses related to therapeutic services provided to Student from January 2021 forward, as well as for the costs of transportation;

    b.   An order that Plaintiffs be reimbursed for the full cost of, and all

expenses related to G.G.'s unilateral placement at Bridges for the 2020-2021 school year from January 2021 through the end of the school year, as well as for the cost of transportation.

c. An order that Plaintiffs be reimbursed for the full cost of, and all expenses related to G.G.'s unilateral placement at Bridges for ESY 2021, as well as for the cost of transportation;

d. An order that Plaintiffs be reimbursed for the full cost of, and all expenses related to G.G.'s unilateral placement at Bridges for the 2021-2022 school year through the date of G.G.'s next Annual IEP, as well as for the costs of transportation;

e. An order that Defendants be ordered to hold an IEP meeting to write goals in the areas of recreational therapy and offer services consistent with the recommendations of the assessor.

132. The Plaintiffs request that this Court order the Defendant to pay Plaintiffs' reasonable attorneys' fees and costs incurred by Plaintiffs related to the underlying due process hearing in this matter;

133. The Plaintiffs request that this Court order the Defendant to pay Plaintiffs' reasonable attorneys' fees and costs incurred in preparation and prosecution of this matter; and

134. Plaintiffs request that this Court award them any such other and further relief

as may be deemed by the Court to be appropriate.

Dated:          November 22, 2021

By: *N Jane DuBovy*
_____

N Jane DuBovy
A2Z Educational Advocates
Attorneys for Plaintiffs
G.G., a minor, and
Rachel and Darren Good